May it please the court. Half a day. My name is Richard Aarons and I'm pleased to be here on behalf of my client, Ryan Jason Wall. Your Honor, I'd like to reserve two minutes if I may. Judge Thomas, Judge Trott, I am here on behalf of Ryan Wall asking this court to reverse the district court's denial of Mr. Wall's motion to suppress evidence. What occurred at the district court level with the issuance of the search warrant was something that I think is problematic for our Fourth Amendment. What happened in this case could happen to any one of us in this room, Your Honor. Counsel, I have a preliminary question. The court made a pretty clear finding, a holding, that this case survives under scrutiny under Leon, that the good faith exception, even if you have a bad search warrant, it wasn't so bad as to require the exclusion of evidence. And at the very last of the court's, the district court's opinion, it says the magistrate's judge's issuance of the warrant in this instance was not clear error, citing United States v. Leon. In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause, again citing Leon. In this case, there is no basis for such determination. I didn't see that you appealed that. I beg your pardon? You did not appeal that. So even if we were to conclude and agree with you that the search warrant is bad, we have a legal holding in this case from the trial court that the good faith exception works and the evidence comes in anyway. And you didn't appeal this. Your Honor, I believe everything was appealed on the basis of the appeal challenging the validity of the affidavit of probable cause. You never mentioned Leon. I mean, there are two questions. Is the warrant bad? And if it's bad, what about Leon? You didn't mention Leon in your brief anywhere. Well, that may be the case. But where I felt there was no need to address Leon was the fact that the informant in this case, there was never established a basis of knowledge, any indicia of reliability. And it is on that basis that we appealed the district court's and the erroneous finding by the magistrate judge. So why don't you address Leon now, just head on? Why do you think the district court was wrong in concluding that the good faith exception saved the warrant? I mean, let's take hypothetically it's a bad warrant, that the affidavit's insufficient. Why doesn't Leon apply? Because there was no, it was reckless of the issuing, or the affiance to You say that it's reckless. Why is it reckless? You know the facts. Somebody called up and had all of this tremendously detailed information. It turns out that the detailed information is correct. They check the package and they find that it's consistent with organic material. So they take it as exactly they were supposed to, to a detached magistrate, and they say here are the facts and circumstances. What's reckless about that? What's reckless about it is in that process, your honor, they must establish a basis of knowledge for the informant. What that informant did without a basis of knowledge, anyone could do, they could do it to me, they could do it to anyone in this courtroom. That is to say, we've got a DHL tracking number, originated in Fife, Washington, going to Guam, addressed to Ryan Wall, and certainly, to say that there was organic matter in a, in the package when it ran through the x-ray, what isn't organic? And I don't say that facetiously, your honor. It seems if we pack anything that is organic, it is organic. Who is the informant? Who is the person who brought this to the attention of the authorities? I never found that out. Did you attempt to? Yes, I did. Why were you unable to find out? The government cited the case of U.S. V. Rollin for the proposition that I wasn't entitled to that information. We knew nothing about the informant. For all we know, this is a disgruntled girlfriend. For all we know, this is someone who just hates Ryan Wall, and on the observations, there was no corroboration. There was corroboration that a package was sent from Fife, Washington, to Guam with this tracking number. Nothing more. And organic matter in the package. This is all the police had. This is all the authorities had. Your honor, respectfully, it is all they had. I know they are not required to do everything humanly possible, but they could certainly have checked that 2006, December 2006 package which was supposedly sent. And what was the agent's excuse for not doing so? He didn't know where to start. He didn't know how to do it. Well, by gosh, he just did it with the January package. He called DHL, said, I've got a tracking number. Do you have such a package? He certainly could have checked the 2006 package. I wouldn't be here today had he confirmed the shipment of the 2006 package. I wouldn't be here today if the officers observed suspicious activity, suspicious wire transfers, phone calls to Fife, Washington from Ryan Wall, banking activity. It could be no more. More reckless than it is on behalf. And I invite the court to look at the judge's last footnote in this case where she said this was close to as bad as it can get. And I think the judge realized that. But without looking at the basis of knowledge of the informant, but merely looking at the tracking number, the DHL package, origin, destination, and the matter, our position is you must look further than that. You must corroborate what is being said. You must make observations. You must know the relationship of the informant to Ryan Wall. We have no idea. The one key was the December 6, 2006 package which allegedly contained five ounces of crystal methamphetamine. They could have made one more phone call and I'd still be in Guam this morning. Pleased to be here. And I would tender myself for any further questions. Why don't you save your time for rebuttal. And you've got about two minutes and 30 seconds. Thank you very much. May it please the court. Good morning, Your Honor. Rosetta St. Nicholas. I work at the Office of the United States Attorney on Guam for the appellee. Your Honor, in this case the issue is whether the tip, the confidential informant, was reliable. And we contend that this informant was reliable. Where is that in the affidavit? Your Honor, first the affidavit, or I'm sorry, the source of the information made, there were two significant things that occurred, Your Honor. First the, there was a telephonic call to DEA on a Friday night saying the drugs are coming into Guam, that they're going to be coming on a DHL flight. And then we have this remarkable fact that there was a ten digit DHL number. Why is that remarkable? Because Let's take the scenario that your opponent talks about. That you have a disgruntled person who is shipping contraband to try to set somebody up and says, here's the package. The fact that they're disgruntled or unhappy or spiteful is irrelevant to this analysis. You're not Aren't you urging here basically that any tip saying there's a package coming is sufficient to trigger probable cause? No, Your Honor. We're not saying that. What made this informant reliable? There's nothing in the affidavit that says this is a reliable informant. There's nothing that says we've used this informant before. There's nothing in the affidavit that says we talked for two hours to this person and we determined this person was truthful and our belief is truthful. Nothing in there, right? No, Your Honor. The affidavit also states that after the tip came in, the telephonic tip came in with the DHL number. Then we know that the source of information met. And I refer the court to Right. That's what I said. They met with the anonymous tipster. Yes, Your Honor. But normally one would see this tipster. We found this tipster to be reliable for so-and-so. All it said was we met with the tipster and the tipster gave us the same information, basically. Well, actually, Your Honor, the tipster provided additional information. And most remarkably, Your Honor, there was a face-to-face conversation. There, the two DEA task force agents were able to put a face to this tipster. This tipster subjected himself to the possibility that if this was a hoax, if this was fabricated, that he would be held responsible for lying to a federal agent. The court doesn't say that in the affidavit. It does not, Your Honor. I mean, you know, we presume that, I guess. But it doesn't say that we informed the tipster that any statements made might be used against him or he could be accused of lying to a federal agent or so forth. I mean, there's nothing about the content of the conversation there that says anything about that. That is correct, Your Honor. And the affidavit merely states that they did meet and that there was additional information provided. But also, Your Honor, the source of information indicated that this was something that had been done previously on December 6th, that this defendant, Ryan Jason Wall, had received another package of methamphetamine containing five ounces of methamphetamine. And also the manner that it was concealed in bath products. You're right, Your Honor, that the affidavit doesn't say that we met for two hours or three hours. And that is Okay. Now let me move ahead. They get the tracking, the shipment comes in, and the drug dog sniffs it and finds nothing, right? Yes. So then, and this seemed to be the pivotal point for the district judge, the magistrate judge, who apparently really wasn't satisfied with the affidavit, put in saying that they determined the contents were organic and natural. Why does that help? We're talking about meth here. Meth isn't organic. You know, synthetic is a chemical. You know, if it were marijuana, that would be entirely different. But you know you're looking for methamphetamine, hydrochloride. Why would the fact that it contains organic matter be in any indicia that it was, in fact, methamphetamine that was in there? Your Honor, I think that that was included in the affidavit to explain why this showed up on this x-ray. Why this was suspicious in nature. And the clarifying statement was the CET determined the contents were organic in nature and Consistent with contraband. Consistent with contraband. How is it consistent with contraband? You know, it didn't say consistent with methamphetamine. I mean, I can understand where it would be consistent if we were shipping marijuana or something like that. You know, it's obviously consistent with that. But how is the presence of organic material consistent with the presence of methamphetamine, hydrochloride? I think, Your Honor, that this was a fact that was added to explain what the results of the x-ray were. It certainly could have been expanded on. Certainly we know from the transcripts later on what that meant to the x-raying technician officer Gansh. But it was not included in the affidavit. Well, but the question is then, the drug dog test, the x-ray shows organic and we're looking for an inorganic compound. Why doesn't that cut against the government? The fact that the, of the negative drug sniff? Negative drug sniff and the fact that now we see you're looking for an inorganic compound and you test positive for an organic compound. Why does that help the government? I think, Your Honor, the fact that the dog had a negative or the dogs had a negative drug sniff is an indication that this is typically the way that drug smugglers bring in their packages. The source of information stated this was concealed in bath products. We know later that it was concealed with heavily scented bath products. The fact that it tested negative or that the drug dogs failed to alert helps the government because it shows that this is consistent with the importation. Are you arguing that any time a drug dog sniffs, whether it's positive or negative result, it's an issue of probable cause? In this case, Your Honor, it's consistent with a sophisticated importer who Where does it say the bath, where, maybe it's, where does it say that the drug dog, that the fact that the drug dog sniffed negative was an indicia that it was concealed in bath products? On page six it does state that the custom detector dogs were performing, was performed, resulting in negative results. It does not state that the evidence is consistent with attempts to conceal, but the magistrate judge could infer from these facts that, that, that that is what that meant. For example, just the fact that drugs are coming from the west coast. We live on Guam. Commonly drugs come from the west coast or Asia. Those are our two places. We know that the drugs that come from Asia are 98% pure. We know that the drugs that come from California or the west coast, Washington, it's a lower purity. We get 72% purity. I don't believe that it really has to be entirely spelled out. I think the judge can make a reasonable inference. If it's coming from the west coast, that's our source of supply, and that actually has been the analysis in some of the cases. I think there was a point. I have a different topic. The Leon exception was cited by the district court. Did you argue Leon, or is that something the district court just put in on, on its own? Initially, Your Honor, I had thought that this, because of the way that the search warrant was being argued, that this was going to turn into a Franks hearing. And the defense said, no, this is not a Franks hearing. We are not making any allegations of reckless disregard. And I actually filed a motion which is included in the appellant's excerpts of record. And that was how, I'm not sure what prompted the judge to do that, but the judge responded to that by citing Leon. And it was included, Your Honor. And you didn't argue Leon in your brief here? No, I did not. When you say it was included, what do you mean it was included? Did you cite Leon to the district court? Your Honor, in the, no, I cited the Franks case, and this is contained in the excerpts of records, page 16. Who is the appellant that prepared this affidavit? His name is Marvin Decimito. He's a task force agent. The affidavit states that he has nine years of experience as a police officer. Who does he work for? He is a task force agent with DEA. And to, he's a DEA person or a local police? He is a local police officer assigned to DEA task force. To who did he take this affidavit? He took it to our magistrate judge, our federal magistrate judge. Federal magistrate judge. Do you review affidavits before they're taken to federal magistrate judges? Yes, we do. Was this one reviewed? It was, Your Honor. How do we know that? In the, during the proceeding, the agent testified that he did have it reviewed and that we were in chambers with him when he went in and filled out these additional additions on the affidavit. So they took the information they had to your office? Correct. And your office approved it? Yes, Your Honor. And then the defiant took it to the magistrate judge and the magistrate judge approved it? Yes, Your Honor. And then defense asked for the district court to review it. They reviewed it and they affirmed the magistrate judge's holding that there was sufficient probable cause. Can you explain to me, then, what the purpose of paragraphs 1 through 14 are? In paragraphs 1 through 14, as I was reading it, it talks about use of sheds, garages, outer extensions and vehicles, automobile titles, jewelry, precious metals, electronics, equipment, it goes on and on. It looks to me like this is just a form. Is that true? I believe that it is. I think that this is something that each agent does have set up and then they tailor it, specifically to the facts and circumstances. I mean, things, for example, the experience may increase as time goes on, but the training and so forth stays the same, unless they are expanded. Well, certainly that would be as good as far as it goes, but then basically he's saying his affidavit that, based on his experience, here's what drug dealers do, and none of it's relevant to this case. I mean, they're putting things in garages and automobiles and ocean-going vessels and they'll possess telephone books, address books, telephone books. I mean, it really goes on in some detail, but none of it was present here. Except for, Your Honor, specifically he stated that he has experience dealing with informants and witnesses who have personal knowledge of drug organizations. He clarifies that these individuals that he interviews, referring to SOIs, have personal information about large-scale drug operations. Right, but this one didn't. I mean, according to the affidavit, they met with, because normally you'd say we've used this person before, this person is knowledgeable and reliable and so forth, and there's none of that in here. That's true, Your Honor, because this is an anonymous tip. What started as an anonymous tip from somebody who had never dealt with the DEA before, and then after the anonymous tip, there are drugs coming to Guam, then we have the face-to-face interview. All I'm suggesting, I guess, is underscoring what the district court said in the footnote, that the affidavit, it would seem you have more information to provide, to give as probable cause than was contained in the affidavit. It would seem to me that most of the affidavit is a cookie-cutter form that isn't tailored to this case, which tends to be less persuasive to me that it would be. But it was supportive of probable cause, just an observation. And I wouldn't have mentioned it, except that you reviewed it. Your Honor, certainly more facts could have been put in, and certainly they had these facts, as this is what came out during the transcript, or in the transcript. But what we did have was enough. And additionally, Your Honor, we have the statutory authority. Why didn't you raise that in front of the district court? I did, Your Honor. Actually, it's contained in the excerpts of record. Why don't you, you can look that up and then give it to our clerk later. We have what we call a gum sheet. I don't know why we call it a gum sheet, because it doesn't seem anything gum about it. But there's a sheet for additional citations you can give to our clerk on the excerpt of record, where you raised that in the district court. Your Honor, it was, and I raised it for two issues. I take it on your word. I just wanted to get that, if you don't mind. All right. Let me explore a little bit footnote four. In the second paragraph, the Court says, and he explained how he used the X-ray and how the package, the manner that the package was wrapped was suspicious in nature, because what we had was, is a bottle. It's a bottle of liquid, and within it there were hard or solid substances. And he thought, apparently the officer testified in the hearing that based on his years of training and experience, the contents of the package were packed in a manner consistent with drug packaging. Is that what he said? He didn't, and, Your Honor, he had more additional information. That wasn't in the affidavit. No, Your Honor, except for the interlineations that stated the CET, and this is referring to Officer Gange, that the contents were organic in nature and through their training and experience consistent with contraband. Furthermore, it says down here, and that when tipping the package, there appeared to be crystalline substances contained there in consistence with methamphetamine. Is that what he testified at the suppression hearing? That never made it into the affidavit. That's correct, Your Honor. Did that reflect on whether there was good faith or recklessness, though, in taking it to the magistrate judge? I think so, Your Honor. I think that they certainly had more and additional information, and it was summarized. That's why they didn't want a Franks hearing, right? I would guess. I mean, the omissions hurt them instead of helped them. Certainly, Your Honor. I think that had there been an elaboration of these facts, of which there was ample, we would be in a better position. But, Your Honor, what was provided does tell a story. For example, the fact of the package was not manifested. That is a huge fact, because when you have a package that's not manifested, it implies that there is some kind of activity going on within maybe the delivery system. Tell me what you mean when you say not manifested. Meaning, Your Honor, that when the DHL system is activated, there is a customs form or some form of manifest saying that this is a package and it's going to be arriving on this certain date. And we have a package that was not on these sheets, and the package went from Fife, Washington to Los Angeles to China and then to Guam, which is, again, another fact that was brought before the magistrate to add to the totality of the circumstances argument. And if that's what we're going to do. Where is that in the affidavit? This is on page 6 of the affidavit, on the excerpts of record, page 7. And these are the interlineations that were handwritten. It's right after line 18 of the affidavit. You know, I can't even read it. Package was not found on the airline manifest. Then there's some kind of a marking. And it states, Your Honor, the package had been. Nothing above the. That's the initial of the affiant, M.D., Marvin Decimito. Okay. And that also appears on the package had been rerouted from Fife, Washington to Los Angeles to China. You know, I must say until your explanation today, I mean, I didn't draw any significance from that. I mean, the affidavit doesn't say and because it was rerouted, this is because of years of experience in addition of the transportation of contraband. Again, Your Honor, the test is under the totality of circumstances. There's fair probability that there will be evidence of contraband or that evidence of a crime will be found in a particular place. We have a series of facts that certainly could be indicative of complete innocence. Sure, we have a package that wasn't manifested. But under the totality of the circumstances, Your Honor, the fact that the source of information had the 10-digit DHL tracking number, that showed that this source of information had intimate knowledge of the defendant's activities. The routing is coming from the West Coast to Guam. The dating is something that was sent out on December 15th and was actually late in arriving to Guam. So somebody is looking for this package and they're looking really hard. And then we have the confirmation. They got on the online DHL site and they confirmed that this package actually is coming in. That was with regard to the first tip. This is just the verbal tip that was made on a Friday night. Then we have the face-to-face interview. Again, under the totality, this kind of fleshes out what occurred. We have two task force agents that met with the source of information. And when we have the meeting, that's where they can assess his or her credibility. And that's where the source of information says the package is coming from Fife going to Ryan Jason Wall. Where does it say in the affidavit that the agents assessed the anonymous tipster as credible during their meeting? The agents testified that certainly in the suppression hearing, but they also indicated on line 16 that at 7 o'clock p.m. within one hour after receiving the anonymous tip they met face-to-face. Yeah, they met face-to-face, but you said they determined that she was credible in a face-to-face meeting. That's not in the affidavit. I understand it's in the suppression hearing. Yes, Your Honor. But again, the task force officer had testified or had stated in his affidavit that he is experienced with dealing with informants and specifically referred to the court that he has the experience in debriefing defendants, informants, and witnesses who have personal knowledge of a drug organization. The officers didn't stop there. They continued. They got the verification that the defendant was actually on Guam. They verified that he had priors on Guam. And then as the informant predicted, the package arrived with that ten-digit DHL number. The package was not manifested, and they noted that it had come on a circular route, circuitous route from 5 China to Guam. I'm afraid you're way over your time. Our questions have taken you longer. No need to apologize. Anything you want to say in summary, though? Your Honor, I think that the agent should be commended for going to the extra extent of getting judicial approval. And that is what the Fourth Amendment encourages. It encourages the agents resorting to a warrant. The agents had enough authority to have customs open the package right there. And instead, Your Honor, they resorted to the judicial approval of our magistrate judge. And we ask that this court defer to the magistrate judge's determination and find that he did have a substantial basis for finding that there was probable cause in this case. Thank you. You know, not to be critical, but if you want to use this case as a learning tool in your own office, I mean, it pops out at me that the agent knew that there was a crystal or had reason to believe there was a crystalline substance in the package, but somehow that didn't get into the affidavit. I mean, that's kind of mind boggling if they're looking for methamphetamine. I want to use this case to go over your assistants who work these over before they go to magistrate judges is how to write a proper affidavit. Your Honor, actually, that's something that we did know. And, Your Honor, I do know that this task force agent was very new, because though he had nine years of experience as a street officer, he was new to the federal system and had just came on and had just a few months at this time. Thank you, Your Honor, for your time. Thank you very much. Rebuttal, we'll give you, you have 235 left. Your Honor, I'd just like to know whether I should address the statutory authority the government referred to, or whether that's a nonissue as I. No, it's always an issue. I mean, I think it's a live issue. In this case, I would suggest that it is a nonissue. Number one, it wasn't raised at the hearing. The prosecutor simply stated to Officer Ganji, could you have opened the package at that time? He said yes. But then what's more curious, as the government thinks, and assuming that he did have the statutory authority to open that package as a customs officer at the Guam International Airport, he didn't open it. He gave it to the DEA, who then opened it. And so my thought in that regard would be that even if he did, which I disagree, that authority of his did not transfer to the DEA such that they now had the authority to. Well, the district court didn't rely on the statute. I mean, I suppose if we wanted to delve into the statute, I gather that probably a factual hearing on that would be required, or do you think we have enough facts in front of us to decide that question? I think you have enough facts, and I'm hoping that when the statutory authority issue is raised, that the court's aware of the fact that it just regards the Guam customs officer and their statutory authority to search. And then, of course, our argument is that that does not transfer to authorize the Department of the DEA. Why doesn't it? I mean, I would understand your argument if the DEA seized it, but if the customs officer seizes it and then gives it to the DEA, why isn't that arguably under the aegis of the customs officer? I was pondering that issue, and to me I analogized it to a situation where a customs officer would have plain view of contraband, and then he goes to the DEA and he says, I saw a bag of dope sitting on a kitchen table as I walked by. Does that transfer to the DEA if they go knock down the door? And perhaps that does take more briefing, but it seems unreasonable to me at this point, at this juncture, to assume that because one entity has been deemed by statute to have the authority to search a parcel, does that transfer in time? Not only hands, but they took it up to the DEA office. They didn't search it right then and there. And it seems that the wisdom of that statute, if there is any wisdom to that statute, would be to search it quickly because of national security concerns or other concerns. I'm not quite sure what to do with the testimony at the suppression hearing in connection with the Leon issue. Did Officer Ganji testify that somehow he perceived in the package before he went to the magistrate judge a crystalline substance? Did he testify to that in the suppression hearing? Yes, he did, but it wasn't in the affidavit. I understand that, but does that reflect on whether he was reckless in taking the case to the magistrate judge or to the U.S. Attorney's office? I'd have to say it would. Well, he didn't take it to the magistrate judge. It was Officer Decimito who never left his office during this investigation. But where is there recklessness? I mean, usually when we're looking for recklessness, we aren't talking about a situation where you have a whole bunch of other good evidence that you just didn't put in the affidavit. You're talking about you're reckless because there were probably indicia that there wasn't probable cause. I mean, what's your best argument on Leon if it's squarely presented? My best argument on Leon would be that the confidential informant was not tested. There was no delving into the basis of knowledge, and without that we would never know. Was it a sister who is going to testify that he has surveillance cameras, and did they go personally observe and corroborate that information? And they did not. They met an informant who said this package is coming in on this tracking number, and that's that. Nothing more, nothing less. It is different than a telephone call coming from somebody who won't show himself or herself. This person at least was willing to show up and personally confront the agents. Doesn't that suggest more than just an anonymous informant? It certainly would, but not enough to rise to the standard of establishing a basis of knowledge. What is the non-manifested part of it? Tell us or not tell us. The package was rerouted all over the place. I don't quite know what to take from that. I thought that would be an issue, and I did not present it in my brief, but at the hearing the officer testified that a lot of packages get rerouted from Los Angeles to China and then to Guam, and he then admitted that by all means that doesn't mean that they're all carrying drugs in them. And I didn't know that would be an issue today, but it was brought up at the court. I don't think the judge gave it any weight. So how did Franks get in this case? How did the district court and how did your opponent come to the belief that you were going to make a Franks motion? Actually, the issue was raised by the government, and I think it was based from my review of the excerpts on my cross-examination of Decimito. I told the judge I was... And is your recollection the same as your opponent's, that the Leon finding by the district court was in response to the Franks allegation or appearance and not to an assertion of Leon by the government? I can't speak to that. Was Leon presented or argued by either of you? No. Except in connection with Franks, perhaps. That's correct. Okay. Well, it's an interesting case. Should we send it back, then, for an appropriate Leon hearing, if it was never argued? Now, as long as you're asking, I'd like to see it sent back, but with an order to suppress the evidence. I understand that. But I think Judge Trott is suggesting that we've got at least two issues. You've got the Guam statute and you've got the Leon issue that weren't fully developed before the district court, and that would you oppose a remand for a hearing on those statutes? I'd be pleased to argue it. I would be pleased to resolve this issue, especially as to the transferability of the right to search that's conferred upon Guam Customs. No, I would be pleased, and I am equally as pleased to be in this beautiful city of San Francisco, and thank you very much. I'm going home where it's warm now. Well, thank you both for your arguments, and I want to thank you both for traveling from Guam over here to argue this case. And it presents a lot of interesting issues, and I thank you both for your presentations. And the case just heard will be submitted. The next case on the oral argument calendar is the Los Angeles Biomedical Research Institute v. White.
judges: Ferguson, Trott, Thomas